**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and ARTHUR H. BUNTE, JR., Trustee, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 11-cv-2991 |
| | ) | |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| TAS INVESTMENT COMPANY LLC, a Michigan limited liability company, and THOMAS A. SINELLI, an individual, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In 2008, Sinelli Concrete, Inc., withdrew from multiemployer pension plan Central States, Southeast and Southwest Areas Pension Fund ("Central States" or "the Fund"). Central States and its trustee determined that Sinelli Concrete's withdrawal triggered a $2,268,184.44 withdrawal liability and in April 2009 filed a lawsuit against Sinelli Concrete and a related entity, Super Trucking, Inc., to collect the alleged withdrawal liability. That suit ended on March 2, 2010, when Central States and its trustee obtained a $2,861,171.75 consent judgment against Sinelli Concrete and Super Trucking. To date, neither Sinelli Concrete nor Super Trucking has made any payments toward the consent judgment. In an attempt to collect on the consent judgment, Central States and its trustee (collectively "Plaintiffs") initiated the instant action against Thomas A. Sinelli, the sole shareholder of both Sinelli Concrete and Super Trucking, and his solely owned entity, TAS Investment Company, LLC.[1] Plaintiffs' five-count complaint

---

[1] This suit is permissible under *Peacock v. Thomas*, 516 U.S. 349 (1996), because (1) the Fund has stated a federal claim pursuant to 29 U.S.C. § 1392(c), which it is permitted to do under 29 U.S.C. §§ 1132(e) & 1451; (2) the requirements of 28 U.S.C. § 1332(a) are satisfied; and (3) Plaintiffs have alleged alter ego

1

alleges successor (Count I) and alter ego (Count III) withdrawal liability against TAS, improper distribution of the assets of Sinelli Concrete and Super Trucking (Count II), evasion or avoidance of withdrawal liability (Count IV), and violation of Michigan's Uniform Fraudulent Transfer Act (Count V). Sinelli and TAS (collectively "Defendants") moved for summary judgment on all five counts [28], and Plaintiffs cross-moved for summary judgment on all five counts [35]. For the reasons stated below, the Court grants in part and denies in part Plaintiffs' motion and denies Defendants' motion.

## I.      Background

The Court takes the relevant facts, which are largely undisputed, primarily from the parties' Local Rule 56.1 statements. The Court did not consider statements that were not supported by citations to admissible evidence or otherwise did not conform with the requirements of Local Rule 56.1. See, *e.g.*, *Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) ("Given their importance, we have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment.").

### A.      Relevant Parties

Plaintiff Central States is a multiemployer pension plan within the meaning of 29 U.S.C. §§ 1002(37) and 1301(a)(3). [38] ¶ 2.  Central States operates out of Rosemont, Illinois. *Id.* ¶ 3. Plaintiff Arthur H. Bunte, Jr., is a present trustee and fiduciary of Central States within the meaning of 29 U.S.C. § 1002(21)(A), and he and his fellow trustees are plan sponsors within the meaning of 29 U.S.C. § 1301(a)(10). *Id.* ¶ 4. Defendant Sinelli ("Mr. Sinelli") is an individual who previously lived in Michigan but currently lives in Florida, [41] ¶ 3, and Defendant TAS is a

liability. See *Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1038 (7th Cir. 2000).

Michigan limited liability company solely owned by Mr. Sinelli. [38] ¶¶ 5, 74. Sinelli Realty is a non-party limited liability company wholly owned by Mr. Sinelli. [41] ¶ 39. Sinelli Concrete and Super Trucking, also non-parties, are both Michigan corporations that, like TAS, operated from 12719 Beech Daly Road in Redford, Michigan. [38] ¶¶ 9-10, 24, 77. Prior to the summer of 2008, Sinelli Concrete produced ready-mix concrete. [41] ¶ 6. In November 2008, Sinelli Concrete notified its employees and the Fund that it was forced to cease operations, [38] ¶ 60, though it had a single customer from November 2008 to May 2010. [9] ¶ 54. Super Trucking's sole operation was leasing trucks and equipment to Sinelli Concrete. [38] ¶ 68; [41] ¶ 7. At all relevant times, Mr. Sinelli was the president and sole shareholder of Sinelli Concrete and Super Trucking. [38] ¶ 23; [41] ¶¶ 8, 14.

**B.     Sinelli Concrete's Financial Difficulties**

Sinelli Concrete had a collective bargaining agreement with Teamsters Local Union 247 that terminated on February 20, 2007. [41] ¶ 19. Sinelli Concrete began experiencing financial difficulties in late 2007 or early 2008 due to the poor economy and its inability to negotiate a new collective bargaining agreement with Local 247. *Id.* ¶ 20. In an April 16, 2008 letter to Local 247, Sinelli Concrete told Local 247 that the company "may not be able to survive" if a new collective bargaining agreement could not be negotiated. *Id.* ¶ 21; [37-2] Ex. 1. In the letter, Sinelli Concrete also expressed concerns regarding unfunded pension liability. [41] ¶ 22; [37-2] Ex. 1. In a second letter to Local 247, dated April 22, 2008, Sinelli Concrete urged Local 247 to accept its "Final Offer" and noted that "in order to comply with the requirements of the Pension Fund it is necessary we have a negotiated agreement by April 27, 2008." [41] ¶ 23; [37-2] Ex. 2. When asked at his deposition whether Sinelli Concrete knew "that if [it] didn't have a new contract with the union, that [it] would be – that Sinelli's contract would be assessed withdrawal

liability," Mr. Sinelli testified, "Yeah, I guess I knew that." [41] ¶ 23; [37-2] at 15:22-16:2. Sinelli Concrete and Local 247 ultimately were unable to reach a new collective bargaining agreement, [41] ¶ 24, even though they negotiated "all summer of 2008," [45] ¶ 29, and federal and state mediators assisted with negotiations on at least three occasions between July 15, 2008 and August 29, 2008. [45] ¶ 30. Sinelli Concrete laid off all of its union employees in late April 2008. [41] ¶ 24. Sinelli Concrete's remaining employees continued to place bids on concrete jobs but were unable to obtain them. [38] ¶ 56. On November 12, 2008, Sinelli Concrete informed the Teamsters and Central States that it would "permanently terminate operations effective November 14, 2008." [45] ¶ 31; see also [38] ¶ 60.

## C.       Sinelli Concrete's Withdrawal Liability

Sometime in 2008 – Plaintiffs say April 26, 2008, see [38] ¶ 12; [41] ¶ 10, and Defendants say October, see [9] ¶12, or November 2008, see [41] ¶ 10 – Sinelli Concrete permanently ceased to have an obligation to contribute to the Fund and/or permanently ceased all covered operations, thereby effecting a "complete withdrawal" from the Fund within the meaning of 29 U.S.C. § 1383. [38] ¶ 12; [41] ¶ 10. As a result of Sinelli Concrete's complete withdrawal, Central States, pursuant to 29 U.S.C. § 1381(b), determined that Sinelli Concrete incurred withdrawal liability in the amount of $2,268,184.44. [38] ¶ 13; [41] ¶ 11. Defendants dispute (and are challenging in an arbitration proceeding, see 29 U.S.C. § 1401) the amount and accrual date of the withdrawal liability. See [41] ¶ 11.

On or about January 19, 2009, Sinelli Concrete received from the Fund a notice and demand for payment of the withdrawal liability in accordance with 29 U.S.C. §§ 1382(2) & 1399(b)(1). [38] ¶ 14; [41] ¶ 12. The notice demanded full payment of $2,268,184.44 by February 1, 2009. [38] ¶ 14; [41] ¶ 12. Sinelli Concrete was required to pay the withdrawal

liability in accordance with the Fund's demand on an "interim" basis pursuant to 29 U.S.C. § 1401(d). [38] ¶ 16. Sinelli Concrete did not make any payments toward the withdrawal liability. [38] ¶ 17; [41] ¶ 13.

On April 30, 2009, Central States and its trustee filed a lawsuit against Sinelli Concrete in the Northern District of Illinois to collect the withdrawal liability. [38] ¶ 20; [41] ¶ 16. Central States also named Super Trucking as a defendant in that suit, alleging that by virtue of the common ownership of the two companies, Sinelli Concrete and Super Trucking were a group of trades or businesses under common control within the meaning of 29 U.S.C. § 1301(b)(1) and were therefore jointly and severally liable for the withdrawal liability. [41] ¶ 15. On March 2, 2010, the Fund (and its trustee) obtained a consent judgment against Sinelli Concrete and Super Trucking in the amount of $2,861,171.75. [38] ¶ 21; [41] ¶ 17. To date, neither Sinelli Concrete nor Super Trucking has made any payments with respect to the consent judgment. [38] ¶ 22; [41] ¶ 18.

### D.    Notes, Guaranties, and Transfers

On June 25, 2008, Mr. Sinelli and Sinelli Concrete entered into a Secured Promissory Note and a Security Agreement. [38] ¶ 25; [41] ¶ 26. The parties dispute the import of these documents. Defendants contend that "[u]nder the Sinelli Concrete Security Agreement, [Mr.] Sinelli obtained and perfected, pursuant to the Michigan Uniform Commercial Code, a security interest in all of Sinelli Concrete's real and personal property to secure the monies that were loaned pursuant to the Note." [38] ¶ 26. Plaintiffs dispute that Mr. Sinelli made "loans" to Sinelli Concrete. See *id.*; see also [41] ¶¶ 27, 32. Notwithstanding this dispute, the parties agree that "[a]lthough the Note said the amounts loaned would bear interest 'at the lowest Applicable Federal Rate authorized by IRS Section 7872,' there was no set schedule of interest payments

established for repayment of the monies that [Mr.] Sinelli had purportedly loaned to Sinelli Concrete, and the interest rate was never calculated nor paid." [41] ¶ 34. The parties also agree that the Note did not have a fixed date for payments; instead, it "merely stated that it shall be paid within thirty (30) days of demand." [41] ¶ 46. At the time the Note was signed, Sinelli Concrete had a net asset value of approximately $135,669.20 and Super Trucking had a net asset value of approximately $366,622.39. [41] ¶ 52.

On June 5, 2009, Mr. Sinelli transferred $400,000 to Sinelli Concrete. [37-2] at 98. That same day, Mr. Sinelli and Super Trucking entered into a Guaranty and Security Agreement. [38] ¶ 27; [41] ¶ 35. Under the Super Trucking Guaranty, Super Trucking guaranteed the repayment of all monies that had been or would be transferred under the Sinelli Concrete Note. [38] ¶ 28; [41] ¶ 36. Pursuant to the Super Trucking Security Agreement, Sinelli purportedly obtained a security interest in all of Super Trucking's real and personal property to secure the repayment of the monies transferred to Sinelli Concrete under the Note. [38] ¶ 29; [41] ¶ 37. Prior to the execution of the Super Trucking Security Agreement, Mr. Sinelli did not have a security interest in any of Super Trucking's assets to secure the repayment of the monies transferred to Super Trucking and Sinelli Concrete. [41] ¶ 38. Mr. Sinelli also entered into guaranty and security agreements with Sinelli Realty on June 5, 2009. [41] ¶ 39.

By June 26, 2009, Mr. Sinelli had transferred a total of approximately $785,000 to Sinelli Concrete under the Note via fourteen separate transfers. [41] ¶ 40; [45] ¶ 12. $460,000 of the money (almost 60%) was transferred between March 2009 and June 2009, after Sinelli Concrete's undisputed receipt of Central States' notice of withdrawal liability in January 2009. See [37-2] at 98. When Mr. Sinelli was asked why he advanced so much money to a company that had shut down its operations, he testified that he hoped to save the company and restart it.

[41] ¶ 40. A letter from Mr. Sinelli's attorney to the Fund also states that Mr. Sinelli advanced money to Sinelli Concrete "based on the reluctance of its bank lenders to renew Sinelli's $400,000 line of credit." [37-2] at 66 ¶ 5. Defendants contend that this statement applied only "to a period towards the end of 2008 after at least $325,000 had already been loaned by Mr. Sinelli to Sinelli Concrete," [41] ¶ 50, which they support with testimony from Mr. Sinelli's accountant, Gordon Leff, that a bank, "after 2008, with little activity, may come to [Mr. Sinelli] or come to [Sinelli Concrete] and go, you know: What's going on; should I continue to keep the line open." [37-3] at 34:18-21. It is undisputed that Leff tells his clients that if they can afford to lend money to their companies, they should do so rather than borrow money and pay interest to a bank. [38] ¶ 36. Leff believes he advised Mr. Sinelli to loan money to Sinelli Concrete rather than rely on a bank loan. [38] ¶ 37. It is undisputed that Leff opined during his deposition that Mr. Sinelli's monetary transfers to Sinelli Concrete were "true loans" that were to be repaid when the company became profitable. [38] ¶ 40.

Prior to receiving the transfers from Mr. Sinelli, Sinelli Concrete had relied on a $400,000 line of credit with Comerica Bank that had been fully borrowed against. [38] ¶ 33; [41] ¶ 41. The parties agree that the line of credit was used for Sinelli Concrete's operating expenses. [45] ¶ 2. They dispute whether it also was used to purchase equipment, [45] ¶ 2; deposition testimony indicates that it "could have been," [37-5] at 41:23-43, and that such use was "possible," [37-2] at 101:1-14, but Mr. Sinelli also testified that he did not know what the line of credit had been used for over the years. See *id.* (Leff also testified that he did not "know offhand" whether the line of credit had been used to purchase equipment. [37-3] at 45:17.) "The line of credit was secured by a lien against Sinelli Concrete's assets." [38] ¶ 35. Mr. Sinelli also executed a personal guaranty in favor of Comerica Bank to secure the repayment of the $400,000

line of credit. [41] ¶ 42. The parties agree that some of the money that Mr. Sinelli transferred to Sinelli Concrete was used to fully pay off the $400,000 line of credit. [38] ¶ 39; [41] ¶ 44.

### E.    Surrender Agreements

On May 11, 2010, approximately two months after the entry of the consent judgment, Mr. Sinelli, Super Trucking, and Sinelli Concrete entered into a "Borrower Surrender Agreement." [38] ¶ 42; [41] ¶ 53. The Borrower Surrender Agreement stated that "[Sinelli Concrete] has failed to pay the Note, its business operation has been dormant for a considerable period of time and collection action has been undertaken by another creditor [Central States], resulting in [Mr. Sinelli] declaring a default of the Note." [41] ¶ 54. Mr. Sinelli testified that he did not know whether he would have declared a default under the Note if Central States had not taken action to collect the consent judgment. [41] ¶ 55. Pursuant to the Borrower Surrender Agreement, all of Sinelli Concrete's assets, including, but not limited to, inventory, chattel paper, accounts, equipment, and general intangibles were surrendered to Mr. Sinelli in purported partial satisfaction of the Note and Sinelli Concrete Security Agreement. [38] ¶ 43; [41] ¶ 56. Also on May 11, 2010, Mr. Sinelli and Super Trucking entered into a Guarantor Surrender Agreement. [38] ¶ 44; [41] ¶ 57. Under the Guarantor Surrender Agreement, all of Super Trucking's assets, including, but not limited to, inventory, chattel paper, accounts, equipment, and general intangibles were surrendered to Mr. Sinelli in purported satisfaction of the Guaranty and Super Trucking Security Agreement. [38] ¶ 45; [41] ¶ 58. In connection with the Surrender Agreements, both Sinelli Concrete and Super Trucking assigned all of their interests in the surrendered assets to Mr. Sinelli. [38] ¶ 46; [41] ¶ 59. A May 18, 2010 appraisal of at least some of the assets of Sinelli Concrete and Super Trucking set their fair market value at $420,900. [38] ¶ 47; [37-3]. The parties agree that Sinelli Concrete's 2010 tax return reflected a $278,000

8

balance owed to Mr. Sinelli. [38] ¶ 48. All other creditors of Sinelli Concrete (except Central States) were paid. [42] ¶ 28; [37-2] at 102:14-24. Mr. Sinelli did not declare a default as to Sinelli Realty, and that entity did not surrender any assets to Mr. Sinelli. [37-2] at 139:8-14.

### F.     TAS Investment Company, LLC

On May 13, 2010, Mr. Sinelli formed limited liability company TAS Investment Company, LLC under the laws of the State of Michigan. [41] ¶ 65. Mr. Sinelli testified that he formed TAS because he wanted a place to put the assets surrendered by Sinelli Concrete and Super Trucking. [38] ¶ 62; [41] ¶ 66; [37-2] at 116:20-117:1. When asked if there was "a reason why the assets could not have remained with Sinelli Concrete and Super Trucking," Mr. Sinelli testified that "You had the judgment against Sinelli Concrete and Super Trucking." [37-2] at 117:4-8. Mr. Sinelli continued, "I wanted them to come to me so that I had the assets because I wanted to get my cash back." *Id.* at 117:10-12. When asked, "So you didn't want Central States to get the assets?" Mr. Sinelli responded, "That's correct." *Id.* at 117:13-15. Mr. Sinelli "testified that he put the assets in TAS to protect them from the Fund (an unsecured creditor) so that Mr. Sinelli could get back the money he loaned to Sinelli Concrete." [42] ¶ 30. In June 2010, Mr. Sinelli assigned all of the assets surrendered by Sinelli Concrete and Super Trucking to TAS. [38] ¶ 63; [41] ¶ 60. The parties agree that TAS, through Mr. Sinelli, was aware of the withdrawal liability and the consent judgment prior to the assignment. [41] ¶ 79.

Like Sinelli Concrete and Super Trucking, TAS operates from 12719 Beech Daly Road in Redford, Michigan. [41] ¶ 70. TAS also uses the phone and fax numbers that were previously used by Sinelli Concrete. [41] ¶ 72. When TAS began its operations, its workforce consisted entirely of two individuals who had previously been employed by Sinelli Concrete. [41] ¶ 73. The management of TAS after the transfers was the same as that of Sinelli Concrete and Super

Trucking before the transfers. [42] ¶ 33. TAS's assets consisted entirely of Sinelli Concrete's and Super Trucking's assets, [42] ¶ 35, and TAS paid some of Sinelli Concrete's debts. [41] ¶ 78; [42] ¶ 40. At some point, "the decision was made" for TAS to try to sell the surrendered assets. [38] ¶ 64. TAS also sold powdered concrete to a single customer, a company owned by a friend of Mr. Sinelli, [38] ¶ 66, which then used the material to manufacture its own concrete. [38] ¶ 65.

## II.    Legal Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On cross motions for summary judgment, the Court construes all facts and inferences "in favor of the party against whom the motion under consideration is made." *In re United Air Lines*, Inc., 453 F.3d 463, 468 (7th Cir. 2006) (quoting *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2005)); see also *Gross v. PPG Indus., Inc.*, 636 F.3d 884, 888 (7th Cir. 2011); *Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to

the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

## III.     Analysis

Although Plaintiffs' complaint is divided into five "counts," it really seeks only one thing: imposition of the withdrawal liability upon TAS and/or Mr. Sinelli. Counts I ("For Withdrawal Liability Against TAS as the Successor") and III ("For Withdrawal Liability Under the Alter Ego Theory") rest upon the same legal provisions and merely present two different legal theories as to why TAS should be subject to the withdrawal liability incurred by Sinelli Concrete. Counts II ("Improper Distributions"), IV ("Evade or Avoid"), and V ("Michigan's Uniform Fraudulent Transfer Act") all allege that the Note, security agreements, surrender agreements, and/or transfers involving Mr. Sinelli, Sinelli Concrete, and Super Trucking were improper and aimed at hampering Central States' collection of the withdrawal liability. Accordingly, the Court analyzes the claims in groups rather than in numerical order.

### A.     Defendants' Liability

#### 1.     Count I: Successor Liability

When a claim involves federal rights, the federal common law of successor liability governs. See *Reed v. Lawrence Chevrolet, Inc.*, 14 F. App'x 679, 687 (7th Cir. 2001) (citing *E.E.O.C. v. G-K-G, Inc.*, 39 F.3d 740, 747-48 (7th Cir. 1994)); *Moriarty v. Svec*, 164 F.3d 323, 329 (7th Cir. 1998). "The general common law rule, designed to maximize the fluidity of corporate assets, is that 'a corporation that merely purchases for cash the assets of another corporation does not assume the seller corporation's liabilities.'" *Upholsterers' Int'l Union*

*Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1325 (7th Cir. 1990) (quoting *Travis v. Harris Corp.*, 565 F.2d 443, 446 (7th Cir. 1977)). The federal common law's "successorship doctrine" provides an exception from this general rule. *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995). The basic theory of successor liability allows lawsuits against even genuinely distinct purchasers of business assets if "(1) the successor had notice of the claim before the acquisition; and (2) there was 'substantial continuity in the operation of the business before and after the sale.'" *Id.* (quoting *E.E.O.C. v. G-K-G, Inc.*, 39 F.3d 740, 748 (7th Cir. 1994)). The Supreme Court and the Seventh Circuit both "have imposed liability upon successors beyond the bounds of the common law rule in a number of different employment-related contexts in order to vindicate important federal statutory policies," *Upholsterers' Int'l*, 920 F.2d at 1326 (citing *Golden State Bottling Co. v. NLRB*, 414 U.S. 168 (1973)), and the Seventh Circuit has noted that there is no "reason why successor liability should not apply in principle to actions seeking recovery of delinquent multiemployer pension fund contributions." *Id.* at 1327; *see also Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 99 (3d Cir. 2011) ("[W]e hold that a purchaser of assets may be liable for a seller's delinquent ERISA fund contributions to vindicate important federal statutory policy where the buyer had notice of the liability prior to the sale and there exists sufficient evidence of continuity of operations between the buyer and seller."). Although the successorship doctrine traditionally applied only when assets were sold, it is "an equitable doctrine," *Chi. Truck Drivers*, 59 F.3d at 49, that has been extended to "encompass not only outright sales of a business but any reorganization that results in a substantial continuation of the business by the successor and either obliterates the previous business or leaves it as an 'empty shell.'" *Cent. States, Se. & Sw. Areas Pension Fund v. Wiseway Motor Freight, Inc.*, 2000 WL

1409825, at *6 (N.D. Ill. Sept. 26, 2000) (quoting *Chi. Dist. Council of Carpenters Pension Fund v. J.F. McCarthy Inc.*, 1996 WL 563459, at *6 (N.D. Ill. Sept. 30, 1996))). The parties are in agreement that it applies here. See [40] at 7.

Successor liability may be imposed when two conditions are met. See *Chi. Truck Drivers*, 59 F.3d at 49. First, the successor must have had notice of the claims before it acquired them. *Id.* The parties agree that this condition is satisfied because "TAS, through Mr. Sinelli, had notice of the withdrawal liability claim against Sinelli Concrete." [40] at 7. Second, there must be a "substantial continuity in the operation of the business before and after" the acquisition. *Chi. Truck Drivers*, 59 F.3d at 49. The parties "vigorously dispute" whether this condition is satisfied. [40] at 7.

Whether "there exist sufficient indicia of continuity between the two companies," *Upholsterers' Int'l*, 920 F.2d at 1329, is a case-specific, fact-intensive inquiry. See *Chi. Truck Drivers*, 59 F.3d at 49 ("[I]n light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate." (quoting *Howard Johnson Co. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 256 (1974))); *cf. Shares, Inc. v. N.L.R.B.*, 433 F.3d 939, 943 (7th Cir. 2006) (explaining that in the context of the National Labor Relations Act, "substantial continuity" is assessed by focusing on a variety of factors, such as "whether the business of both enterprises is the same; whether the employees of the new company are doing the same job under the same working conditions with the same supervisors; and whether the new entity has the same production process, produces the same products and basically has the same body of customers as the former company"). The Seventh Circuit has explained that "continuity in this context is not only a question of an identity

of officers, directors and shareholders; it is also an 'amalgamation of a number of indicia,' including whether the post-sale business (1) uses the same location, workforce, and supervisors; (2) maintains the same jobs under substantially the same working conditions; (3) uses the same machinery, equipment, and methods of production, and (4) provides the same products and services." *Reed*, 14 F. App'x at 687. In finding adequate continuity of operations in *Upholsterers' International*, for instance, the Seventh Circuit found important facts such as the successor's employment of "substantially all" of the predecessor's workforce, including supervisors and vice presidents; its use of the predecessor's plant, machinery, and equipment to produce the same products; its completion of the predecessor's unfinished work orders; and its agreement to honor the predecessor's warranties. *Upholsterers' Int'l*, 920 F.2d at 1329. As a court within this district more recently explained, "[C]ontinuity requires that the new company has acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations. In making this determination, the court considers whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." *Chi. Regional Council of Carpenters Pension Fund v. Estate Installations, Inc.*, No. 11-cv-2924, 2013 WL 500833, at *2 (N.D. Ill. Feb. 8, 2013) (quotations and citations omitted).

Each side contends that the facts support its view of continuity or lack thereof. Central States points to several facts that in its view establish continuity of operations: "(1) after it was formed, TAS's assets consisted entirely of the Surrendered Assets; (2) immediately after TAS was formed, Sinelli Concrete ceased operating; (3) both companies had the same owners and

14

management; (4) TAS operated from the same location from which Sinelli Concrete operated; (5) TAS used the same phone and fax number that Sinelli Concrete had used; (6) TAS's operation consisted of purchasing and selling cement powder, which was Sinelli Concrete's sole operation from November of 2008 to May of 2010 (when Sinelli Concrete ceased operating); (7) TAS bought the cement powder from the same merchant from whom Sinelli Concrete had bought its cement powder and sold it to the same customer to which Sinelli Concrete had sold the cement powder; (8) TAS's workforce consisted entirely of individuals who were previously employed by Sinelli Concrete; and (9) TAS paid some of Sinelli Concrete's debts." [36] at 7. Central States also asserts that other facts, namely that TAS was set up "to protect Sinelli Concrete's assets from the Fund," require a finding of successor liability. [36] at 8. Defendants, who dispute some of these facts, emphasize others that in their view indicate a lack of continuity. They contend: "(1) Although TAS and Sinelli Concrete had similar assets, Sinelli Concrete used those assets to manufacture and deliver cement products, TAS only holds those assets to sell them; (2) Sinelli Concrete ceased operations in November of 2008 but TAS was not formed until May of 2010 and did not hire employees until November of 2010; (3) TAS and Sinelli Concrete both occupy the same location but Sinelli Concrete employed a number of people to produce and deliver cement products from that location and TAS never has; (4) Although TAS and Sinelli Concrete had the same telephone number, they did not share similar product lines or customers; (5) TAS' 'operation' is 'basically' liquidating the surrendered assets. Although it does sell powder which Sinelli Concrete did in 2008 and earlier, such sales are to a different although related party. Furthermore, Sinelli Concrete did not sell such powder during 2009 so there was a substantial gap in time; (6) of the more than 15 employees Sinelli Concrete had, only two perform services for TAS, Michelle Mulligan who works only four hours per week for TAS, but

was a full time, full service bookkeeper for Sinelli Concrete, and Lynn Carnacchi who was the plant manager of an active concrete facility for Sinelli Concrete and now is a caretaker attempting to sell used equipment for TAS." [40] at 9-10.

The Court concludes that neither side is entitled to summary judgment on the fact-intensive issue of successor liability because there are several disputes as to the key facts that the Court must consider as part of its totality of the circumstances analysis. Most notably, the parties dispute whether Sinelli Concrete conducted any business from November 2008 to May 2010, whether TAS had the same customer(s) and line of business as Sinelli Concrete, and whether and to what extent the employees at TAS act in the same capacity and under the same circumstances as they did at Sinelli Concrete.

Moreover, the facts in the instant case are less clear-cut than those in cases in which summary judgment has been granted.[2] For instance, in *Central States, Southeast & Southwest Areas Pension Fund v. Hayes*, 789 F. Supp. 1430, 1436 (N.D. Ill. 1992), the court granted summary judgment in favor of a pension fund after it found that "under the totality of the circumstances, New Midland is Old Midland's successor. New Midland operates the same type of business as Old Midland; renders the same services in the same manner; operates from the same business premises as Old Midland; employs Old Midland employees in the same capacities; uses Old Midland's trucks; and delivers to most of Old Midland's customers. Two

---

[2] Central States cited *Sullivan v. Alpine Irrigaton Co.*, No. 09-cv-2329, 2011 WL 5599504, at *1 (N.D. Ill. Nov. 14, 2011) as an exemplar case in which a "[c]ourt[ ] in this District [has] found successor liability under similar factual circumstances." [36] at 7. The Court has not considered this document because it is not an opinion of the court but rather is a motion for entry of judgment by a party seeking the imposition of successor liability. In fact, the court in *Sullivan* did "not comment or rule on the issue of Respondents' potential liability * * *." See Case No. 09-cv-2329 (N.D. Ill.) [52] at 13 (report and recommendation of Magistrate Judge Keys); [60] (minute order overruling objections to report and recommendation). The Court has no reason to believe that Central States intended to mislead the Court by citing this document. Defendants also overlooked the true nature of the *Sullivan* "opinion" in their efforts to distinguish it. See [40] at 10. Neither party has pointed the Court to any other district court case discussing successor liability.

additional facts also support the court's conclusion: (1) New Midland conducted business, and held itself out to the public, as Old Midland for at least the first two months of its operations; and (2) New Midland continued to use Old Midland's bank account to pay employee salaries and other business expenses." Here, the factors favoring Central States – when taken in the light most favorable to Defendants – are not as overwhelming. See also *Cent. States, Se. & Sw. Areas Pension Fund v. Ehlers Distrib., Inc.*, No. 11-cv-2691, 2012 WL 2726759, at *1 (N.D. Ill. July 9, 2012) (granting summary judgment for pension fund where "[d]espite the transfer, the business carried on without change: Ehlers Dist. assumed Dairy Trust's business, conducted the same type of business (the delivery of fluid dairy products), operated from the same location, employed the same individuals, used the same delivery trucks, served substantially the same customers and on the same contractual terms, relied on the same professional advisors, and used the same vendors"); *Chi. Dist. Council of Carpenters Pension Fund v. Artistry Woodworking, Inc.*, No. 92-cv-2069, 1997 WL 12794, at *2 (N.D. Ill. Jan. 10, 1997) (finding continuity between two firms, Woodstone and Artistry, where "(1) Woodstone was managed by its president Ryter, who was the sole shareholder in Artistry; (2) Artistry and Woodstone operated out of the same warehouse and Ryter was the lessee for both; (3) five Artistry employees were later employed by Woodstone; (4) Woodstone agreed to lease all of the machinery, equipment, and vehicles owned by Artistry; and (5) Woodstone's customer list includes several Artistry customers"). Likewise, the factors favoring Defendants – when taken in the light most favorable to Plaintiffs – are not as clear as those supporting summary judgment in defendants' favor in *Chicago Regional Council of Carpenters Pension Fund v. Estate Installations, Inc.*, No. 11-cv-2924, 2013 WL 500833, at *3-4 (N.D. Ill. Feb. 8, 2013) (granting summary judgment for defendant where "the record is devoid of facts demonstrating that these workers completed their jobs in the same working

conditions or that these employees reported to O'Donnell as their supervisor in the same manner as they had done at Estate," the record failed to establish that the "businesses of both employers were essentially the same," the second company "acquired no assets" from the first, the parties disputed the exact role of a key employee, and "the majority of [the second company's] new contracts were from companies that had never worked with [the first]").

### 2. Count III: Alter Ego Liability

Plaintiffs also contend in Count III of their complaint that TAS is the alter ego of Sinelli Concrete and is therefore liable for the withdrawal liability. The alter ego doctrine is a "sword" that allows "plaintiffs to pierce the corporate veil to impose liability on a defendant who unjustly seeks protection in the corporate form." *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.3d 449, 460 (7th Cir. 1991). "Essential to the application of the alter-ego doctrine is a finding of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as a sham transfer of assets." *Cent. States Se. & Sw. Areas Pension Fund v. Cent. Transport, Inc.*, 85 F.3d 1282, 1288 (7th Cir. 1996) (citing *Int'l Union of Operating Eng'rs, Local 150 v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312 (7th Cir. 1987)). Consequently, "unlawful motive or intent are critical inquiries in an alter-ego analysis." *Id.* The Seventh Circuit has identified three other factors that the Court also should consider: "1) the amount of respect given to the separate identity of the corporation by its shareholders; 2) the fraudulent intent of the incorporators; and 3) the degree of injustice visited on the litigants by respecting the corporate entity." *Id.* Other important but non-determinative factors that courts have considered in determining alter ego status include common management, identical corporate ownership, business purpose, operations, equipment, customers, and supervision. See

*Painters Dist. Council. No. 30 Pension Fund v. Reece Servs., Inc.*, 932 F.2d 971, 1991 WL 79083, at *3 (7th Cir. May 16, 1991).

Here, the undisputed facts support the imposition of alter ego liability. Regardless of whether the monies that Mr. Sinelli transferred to Sinelli Concrete are properly considered "loans" or "capital contributions," the evidence in the record unequivocally demonstrates that TAS was formed, at least in part, to hamper Central States' ability to collect the withdrawal liability. Defendants admit that "Sinelli wanted to protect the assets from the Fund's efforts to collect the Consent Judgment," [42] ¶ 30, and affirmatively represent that "Mr. Sinelli * * * testified that he put assets in TAS to protect them from the Fund (an unsecured creditor) so that Mr. Sinelli could get back the money he loaned to Sinelli Concrete." *Id.* Notwithstanding any noble motives or intentions that Mr. Sinelli also may have had, this uncontroverted evidence, even when taken in the light most favorable to Defendants, demonstrates "an attempt to avoid the obligations of a collective bargaining agreement." *Cent. States Se. & Sw. Areas Pension Fund v. Cent. Transport, Inc.*, 85 F.3d 1282, 1288 (7th Cir. 1996). Other undisputed facts, such as the common management, supervision, and identical corporate ownership of Sinelli Concrete and TAS; TAS's ownership of all the assets of Sinelli Concrete and Super Trucking; the business purpose of TAS (protecting the assets surrendered by Sinelli Concrete and Super Trucking from collection by Central States); the fact that Mr. Sinelli called a default as to Sinelli Concrete and Super Trucking but not Sinelli Realty; and Mr. Sinelli's testimony that he did not know whether he would have declared a default under the Note if Central States had not taken action to collect the consent judgment all suggest an unjust use of the corporate form by Mr. Sinelli and TAS. It is true that Mr. Sinelli did not actively conceal his transactions with Sinelli Concrete and Super Trucking, or his formation of TAS, but the openness of his machinations does not negate their

import. Perhaps, as Defendants suggest, Comerica Bank would have called its $400,000 loan and depleted Sinelli Concrete's assets, but absent the transfers and guaranties and surrender agreements that in fact were signed, Central States still would have been able to seek payment from Super Trucking, which held valuable assets such as trucks. Moreover, the "degree of injustice visited on" Plaintiffs by respecting the corporate form of TAS exceeds the "degree of injustice visited on" Defendants, who were aware of the withdrawal liability incurred by Sinelli Concrete at the time TAS was formed and took control of Sinelli Concrete's and Super Trucking's assets.

Accordingly, the Court grants Plaintiffs' motion for summary judgment as to Count III and denies Defendants' motion for summary judgment as to Count III.

### B.     Nature of Transfers

Plaintiffs allege in Counts II, IV, and V that the agreements among Mr. Sinelli, Sinelli Concrete, and Super Trucking, as well as the transfer of funds among those entities and TAS, were made for improper purposes and should be disregarded or avoided.

### 1.     Count IV: Evade or Avoid

In Count IV of their complaint, Plaintiffs allege that the transfers from Sinelli Concrete and Super Trucking to Mr. Sinelli (and subsequently TAS) should be disregarded pursuant to 29 U.S.C. § 1392(c) because a principal purpose underlying them was evasion or avoidance of the withdrawal liability. [3]  Defendants maintain that the transactions were not designed to evade or avoid the withdrawal liability. Both sides have moved for summary judgment on this claim.

---

[3] Claims under § 1392(c) typically are arbitrated, see *Chi. Truck Drivers*, 525 F.3d at 597 (citing *Banner Indus., Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 875 F.2d 1285, 1288 (7th Cir. 1989)), but the claim is properly before the Court here because this is not a "dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of [Title 29]." See 29 U.S.C. § 1401(a); *Transpersonnel, Inc. v. Roadway Express, Inc.*, 422 F.3d 456, 459 n.1 (7th Cir. 2005) ("Since only an 'employer' is required to arbitrate, the district court may address this

Section 1392(c) is part of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), a series of amendments to the Employee Retirement Income Security Act of 1974. It was designed to "ensure that employers live up to the obligations they owe to the pension fund and to the employees who participate in it." *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. El Paso CGP Co.*, 525 F.3d 591, 596 (7th Cir. 2008). The MPPAA recognizes that "employers that have substantial pension liabilities may attempt to shirk their obligations through deceptive transactions," *id.*, and to that end provides at 29 U.S.C. § 1392(c) that "[i]f a principal purpose of any transaction is to evade or avoid liability * * * liability shall be determined and collected [ ] without regard to such transaction." This provision "negates the effect of transactions that are intended to evade or avoid liability," *Trustees of Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Leaseway Transp. Corp.*, 76 F.3d 824, 831 n.10 (7th Cir. 1996), and is intended to "discourage[ ] companies from using corporate forms and manipulations to shield themselves from withdrawal liability." *Chi. Truck Drivers*, 525 F.3d at 596. In other words, liability will be determined as if the transaction to evade or avoid liability never occurred, and a plaintiff can reach those "assets that were transferred in order to 'evade or avoid liability,' *as well as the parties to whom they were improperly transferred.*" *Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Ill. Range*, 186 F.R.D. 498, 502 (N.D.Ill.1999) (emphasis in original) (quotation omitted).

Both parties have cited case law supporting the proposition that § 1392(c) does not require that "the" principal purpose of a transaction be the evasion or avoidance of withdrawal liability, but rather requires only that "a" principal purpose of the transaction be the evasion or avoidance of withdrawal liability. See [29] at 16 (citing *Teamsters Joint Council No. 83 of Va.*

threshold question before arbitration." (quotation omitted)); *id.* at 460 ("[A]n 'employer' under the MPPAA is 'a person who is *obligated to contribute* to a plan either as a direct employer or in the interest of an employer of the plan's participants."); *Banner Indus.*, 875 F.2d at 1288 & n.2.

*Pension Fund v. Empire Beef Co.*, 2011 WL 201492, at *3 (E.D. Va. Jan. 20, 2011)); [36] at 16

(citing *Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas Pension Fund*, 22 F.3d 725, 727 (7th

Cir. 1994)). Indeed, the Seventh Circuit has explained that withdrawal liability "need only have

been one of the factors that weighed heavily" in the transaction, and that the "clear import of [the

language] 'a principal' is to let the employer off the hook even if one of his purposes was to beat

withdrawal liability, provided however that it was a minor, subordinate purpose, as distinct from

a major purpose." *Santa Fe Pac. Corp.*, 22 F.3d at 727. "The statutory criterion is not whether

the transaction is a sham, having no purpose other than to defeat the goals of the Multiemployer

Pension Plan Amendments Act by leaving the other employers in the multiemployer pension

plan holding the bag. It is whether the avoidance of withdrawal liability by the [transferor] (not

necessarily by the [transferee] as well) is one of the principal purposes of the transaction." *Id.* at

729-30.  In the case cited by Defendants, the district court considered three primary factors in

assessing whether the purpose of a transaction was principal or merely incidental: the size of the

withdrawal liability as compared to other liabilities of the corporate entity; the adequacy of the

consideration supporting the transaction; and the timing of the transaction. See *Empire Beef*,

2011 WL 201492, at *4.

The undisputed facts indicate that evasion of the withdrawal liability was a principal

purpose of at least the chain of transactions initiated by the execution of the Borrower Surrender

Agreement and the Guarantor Surrender Agreement. (That is, the execution of the agreements,

Sinelli Concrete's and Super Trucking's assignment of assets to Mr. Sinelli, Mr. Sinelli's

formation of TAS, and the assignment of the Sinelli Concrete and Super Trucking assets to

TAS.) The Borrower Surrender Agreement was executed on May 11, 2010, a mere two months

after Central States obtained a sizeable consent judgment against two of the three parties to it,

22

Sinelli Concrete and Super Trucking. The prefatory recitals in the Borrower Surrender Agreement state that "Borrower [Sinelli Concrete] has failed to pay the Note, its business operation has been dormant for a considerable period of time and collection has been undertaken by another creditor [Central States], resulting in the Secured Party [Mr. Sinelli] declaring a default of the Note, a demand for payment and delivery of the Collateral." [37-2] at 127. The Guarantor Surrender Agreement, which was also executed on May 11, 2010, contains the same recital. See *id.* at 133. It is apparent from the face of these agreements that the collection efforts being made by Central States were sufficiently important to the signatories to be memorialized. Mr. Sinelli testified at his deposition that he did not know whether he would have declared a default under the Note if Central States had not taken action to collect the consent judgment. Taken in the light most favorable to him, that statement is equivocal; taken in the light most favorable to Plaintiffs, it suggests that Central States' collection efforts were a driving force behind his decision. It is also undisputed that all of Sinelli Concrete's other creditors were paid before the execution of these agreements; that Mr. Sinelli formed TAS mere days later to hold the assets surrendered pursuant to the agreements; and that Mr. Sinelli did not call a default as to Sinelli Realty, against which no judgment was pending. Irrespective of whether the transfers to Sinelli Concrete were loans in the first place, what prompted Mr. Sinelli to make them, or whether Mr. Sinelli's security interest constituted adequate consideration for those transfers, the timing and nature of the efforts undertaken to unwind them point directly to the conclusion that avoidance of the withdrawal liability was a driving concern.

Defendants argue that this conclusion "would require the courts to undo all security interests that are granted to any party who loans money to a withdrawing employer and then exercises its rights to the security." [40] at 15. The Court is not persuaded by this policy

argument. All security interests are not taken by a sole shareholder who exercises his rights to the security shortly after his corporate entities became subject to a sizeable consent judgment, but not before all other unsecured creditors are paid off.

Because certain key facts are currently the subject of arbitration or otherwise in dispute – namely, the date on which the withdrawal liability accrued, at what point Sinelli Concrete ceased to be a going concern, whether the transfers were true loans or capital contributions, and what Mr. Sinelli's motivations were in transferring the funds – the Court declines to resolve at this stage whether the Note and all the transfers associated with it had as a principal purpose the evasion or avoidance of the withdrawal liability. The Court grants in part and denies in part Plaintiffs' motion for summary judgment on Count IV, and denies Defendants' motion for summary judgment on Count IV.

### 2. Counts II ("Improper Distribution") & V (Violations of Michigan Uniform Fraudulent Transfer Act)

In Count II of their complaint, Plaintiffs allege that the transfers Mr. Sinelli made to Sinelli Concrete were capital contributions, not loans, and were "part of a scheme to make improper shareholder distributions to [Mr.] Sinelli in preference to creditors such as the Pension Fund." [1] ¶ 67. In Count V, Plaintiffs allege that the execution of the Note, Guaranty, security agreements, surrender agreements, and the transfer of the surrendered assets to TAS violated two provisions of the Michigan Uniform Fraudulent Transfer Act (MUFTA), Mich. Comp. Laws §§ 566.34 & 566.35(1). The Court analyzes these seemingly disparate claims together because the ultimate question at their core is the same: were the transfers "loans" or were they "capital contributions"?

### a. MUFTA § 566.35(1)

The MUFTA "was designed to protect creditors against debtors who transfer their property in a manner that impairs creditors' rights." *Bennett v. United States*, 2010 WL 5114331, at *8 (E.D. Mich. Dec. 9, 2010); *see also Steinberg v. Young*, 2010 WL 3190849, at *6 (E.D. Mich. Aug. 11, 2010) (explaining that the MUFTA "was designed to protect unsecured creditors against debtors who make transfers out of, of make obligations against, the debtor's estate in a manner adverse to the creditor's rights"). Section 5 of the MUFTA, Mich. Comp. Laws § 566.35(1), provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Thus, a conveyance is fraudulent for purposes of § 566.35(1) if (1) the creditor's claim arose before the transfer; (2) the debtor made the transfer without receiving reasonably equivalent value; and (3) the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer.

For purposes of the MUFTA, a "debtor" is "a person who is liable on a claim." Mich. Comp. Laws § 566.31(f). A debtor is "insolvent" if "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." Mich. Comp. Law § 566.32(1). "A debtor who is generally not paying his or her debts as they become due is presumed to be insolvent." *Id*. § 566.32(2). "Assets" are "property of a debtor," exclusive of that "encumbered by a valid lien." *Id*. § 566.31(b)(i). For purposes of the insolvency definition, "[a]ssets do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under [the MUFTA]." *Id*. § 566.32(4)(a). Further, "[d]ebts do not include an obligation to the extent it is secured by a valid

lien on property of the debtor not included as an asset." *Id.* § 566.32(b). A "transfer" is any "mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset," including "payment of money, release, lease, and creation of a lien or other encumbrance." *Id.* § 566.31(*l*).

Plaintiffs argue that their claim arose on April 26, 2008, "when Sinelli Concrete triggered a complete withdrawal from the Fund." [36] at 18. They also assert that Sinelli Concrete was insolvent at the time of the transactions, and that the monies Mr. Sinelli transferred to Sinelli Concrete were capital contributions and therefore not supported by reasonably equivalent value. Defendants maintain that the transfers Mr. Sinelli made to Sinelli Concrete were loans. As explained earlier, they also dispute the accrual date of the withdrawal liability – an issue that is currently being arbitrated – and contend that Sinelli Concrete was solvent at the time the transfers were made.

Summary judgment on this issue is not appropriate for either party at this time because there are several disputed issues of fact. The date on which the withdrawal liability accrued is a disputed fact that is being adjudicated in an arbitral forum. Sinelli Concrete's financial status at the time of the transfers also is disputed. The parties agree that Sinelli Concrete "started experiencing financial difficulties in late 2007 or early 2008," [41] ¶ 20, that it incurred a net loss of $458,038.22 in 2008, *id.* ¶ 25, and that it "would not have been able to pay its bills if Sinelli had not 'loaned' monies to the company and would not have been able to survive." *id.* ¶ 45. As to the actual solvency of Sinelli Concrete, however, the only evidence to which the parties point is equivocal deposition testimony from accountant Leff. Leff opined that "in 2008 this company [Sinelli Concrete], even as late as December, was still solvent. Its assets at that time could have still paid off its debtors." [37-3] at 33:8-12. But Leff also stated that it was possible that Sinelli

Concrete was insolvent at that time. *Id.* at 33:18. On this record, the Court cannot conclude as a matter of law that Sinelli Concrete was insolvent or became insolvent as a result of the transfers. As explained further below, the nature of the transactions is also disputed.

### ii.      MUFTA § 566.34 & Count II

Plaintiffs also allege that Defendants violated Section 4 of the MUFTA, Mich. Comp. Law § 566.34, which provides:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following:
>> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor.
>> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor did either of the following:
>>> (i) Was engaged or was about to engage in a business transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
>>> (ii) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Subsection (2) of the provision sets forth various factors, referred to in the case law as "badges of fraud," see, *e.g.*, *United States v. Real Property Commonly Known as 113 Maynard Avenue, N.W., Grand Rapids, Mich., Kent Cnty.*, 834 F. Supp. 2d 713, 719 (W.D. Mich. 2011); *Bentley v. Caille*, 286 N.W. 163, 164 (Mich. 1939) ("Surrounding circumstances which usually accompany an intent to hinder, delay, or defraud creditors and from which fraud may be inferred are called 'badges of fraud.'"), that courts may consider in assessing the "actual intent" underlying the transfer. See *Bentley*, 286 N.W. at 164 ("The only method of determining actual intent is by a consideration of the circumstances surrounding the transaction."). "Badges of fraud are not conclusive, but are more or less strong or weak according to their nature and the number

occurring in the same case, and may be overcome by evidence establishing the bona fides of the

transactions." *Id.* (quotation omitted). These "badges of fraud" listed in § 566.34(2) are:

    (a)    The transfer or obligation was to an insider.

    (b)    The debtor retained control of the property transferred after the transfer.

    (c)    The transfer or obligation was disclosed or concealed.

    (d)    Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

    (e)    The transfer was of substantially all of the debtor's assets.

    (f)    The debtor absconded.

    (g)    The debtor removed or concealed assets.

    (h)    The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

    (i)    The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

    (j)    The transfer occurred shortly before or shortly after a substantial debt was incurred.

    (k)    The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Mich. Comp. Laws §§ 566.34(2). Where, as here, the debtor is a corporation, the term "insider"

includes "a person in control of the debtor." Mich. Comp. Laws § 566.31(g)(ii)(C). "Affiliates"

of the debtor, see *id.* § 566.31(a), are also considered "insiders." *Id.* § 566.31(g)(iv). Transfers

are not voidable under § 566.34(1)(a) "against a person who took in good faith and for

reasonably equivalent value or against any subsequent transferee or obligee." Mich. Comp. Laws

§ 566.38(1). And property that is "encumbered by a valid lien" is not considered an "asset" of a

debtor. *Id.* § 566.31(b)(i).

    Plaintiffs contend that the transactions among Mr. Sinelli, Sinelli Concrete, and Super

Trucking bore several of the listed "badges of fraud," such that the Court must grant summary

judgment in their favor. Specifically, Plaintiffs contend that both Mr. Sinelli and TAS are

"insiders"; that Sinelli Concrete essentially retained possession or control of the property

transferred to TAS because both entities are owned by Mr. Sinelli; that "the Transactions was

[sic] concealed and were not discovered until Central States was conducting post-judgment discovery; (4) before some of the Transactions, Sinelli Concrete had already been sued by the Fund; (5) the Transactions involved all of Sinelli Concrete's assets; (6) Sinelli Concrete was insolvent before the Transactions; (7) the Transactions occurred shortly after a substantial debt (i.e., the Withdrawal Liabilty) was incurred; and (8) Sinelli Concrete transferred the essential assets to a lienor (Sinelli) who transferred the assets to an insider (TAS)." [36] at 19-20.

Defendants also seek summary judgment. They assert that "the adequacy of consideration clearly defeats a claim under section (a) of the statute is [sic] should be given deference under section (b) analysis as well." [29] at 19 (presumably referring to Mich. Comp. Laws § 566.38(1)). Defendants concede that the transfers involved "insiders," and that Sinelli Concrete and Super Trucking ultimately transferred all their assets to Mr. Sinelli, *id.*, but claim that the other "badges of fraud" enumerated in the statute are absent here. Defendants contend that the debtors did not retain possession or control over the property after the transfers, that the transfers were not concealed, that the debtors did not abscond, that the value of consideration received by the debtor exceeded the value of the assets transferred, that Sinelli Concrete and Super Trucking "were not insolvent in uncontroverted opinion of their independent certified public accountant," that "the grant of interest occurred 8 months before any substantial debt was incurred and only after continuing negotiations with the teamsters local broke down, and that "[t]here was no three way, or any other, transaction to disguise or conceal the nature of the transaction." [19] at 20.

Defendants rely on *Sudden Service, Inc. v. Brockman Forklifts, Inc.*, 647 F. Supp. 2d 811, 817 (E.D. Mich. 2008), in which the court determined that "the dispositive question" when both parties agreed that "a transfer of money and a distribution of assets" from a corporation to its sole shareholder occurred was "whether the payments by [the shareholder] to [the debtor

corporation] were *equity* contributions or *loans* to the business." The *Sudden Service* court reasoned that "[i]f a conveyance is made to satisfy an alleged antecedent debt which is not shown to have existed, then fair consideration is lacking * * * and the conveyance may be set aside." *Id.* (quoting *Ret. Benefit Plan of Graphic Arts Int'l Union Local 20-B v. Standard Bindery*, 654 F. Supp. 770, 774 (E.D. Mich. 1986)). Although the analysis in *Sudden Service* appears to have been predicated on a provision of the now-repealed Michigan Uniform Fraudulent Conveyance Act, Mich. Comp. Law § 566.19, transactions under both schemes "made with the actual intent to defraud creditors and conveyances made by an insolvent debtor without the receipt of reasonably equivalent value in exchange are fraudulent." *United States v. Porath*, 490 F. App'x 789, 795 n.3 (6th Cir. 2012); see also *In re Hurtado*, 342 F.3d 528, 532 n.1 (6th Cir. 2003) ("Conveyances that are made with actual intent to defraud creditors are still fraudulent under the new Mich. Comp. Laws § 566.34(1) (1999), although the 'badges of fraud' are now explicitly listed in the statute, see § 566.34(2) (1999)."). Plaintiffs neither have attempted to distinguish *Sudden Service* nor have provided the Court with more up-to-date case law (indeed, *any* case law relating to their MUFTA claim), and the Court through its own efforts has not found any indication that the reasoning in *Sudden Service* is faulty. To the contrary, the definition of "assets" set forth in the MUFTA suggests that property encumbered by a valid lien is not subject to recovery by a creditor.

The question thus boils down to whether the $785,000 worth of transfers that Mr. Sinelli made to Sinelli Concrete were "loans" or "capital contributions." As this is the same query presented by Count II, the Court applies the single analysis that the parties agree is controlling: that set out by the Sixth Circuit in *Roth Steel Tube Co. v. Comm'r of Internal Revenue*, 800 F.2d

625 (6th Cir. 1986).[4] In *Roth*, the court held that "[t]he determination of whether advances to a corporation are loans or capital contributions depends on whether the objective facts establish an intention to create an unconditional obligation to repay the advances." *Roth*, 800 F.2d at 630. The court then identified eleven factors to be used in "making the capital contribution versus loan determination":

> (1)    the names given to the instruments, if any, evidencing the indebtedness;
> (2)    the presence or absence of a fixed maturity date and schedule of payments;
> (3)    the presence or absence of a fixed rate of interest and interest payments;
> (4)    the source of repayments;
> (5)    the adequacy or inadequacy of capitalization;
> (6)    the identity of interest between the creditor and the stockholder;
> (7)    the security, if any, for the advances;
> (8)    the corporation's ability to obtain financing from outside lending institutions;
> (9)    the extent to which the advances were subordinated to the claims of outside creditors;
> (10)    the extent to which the advances were used to acquire capital assets; and
> (11)    the presence or absence of a sinking fund to provide repayments.

*Roth*, 800 F.3d at 630. "No one factor is controlling or decisive, and the court must look to the particular circumstances of each case." *Id.* The parties agree that factors (2) and (11) point toward capital contribution, but dispute the import of the others.

The facts underlying many of the other factors are also in dispute. For instance, the parties dispute the extent to which the advances were used to acquire capital assets (10), and whether Sinelli Concrete was able to obtain funding from an outside lending institution (8). The parties also dispute the adequacy of Sinelli Concrete's capitalization (5), though they agree that a

---

[4] The Seventh Circuit enumerated a similar list of factors in an unpublished decision, *Price v. Commissioner of Internal Revenue*, 142 F.3d 440, 1998 WL 234520, at *2 (7th Cir. May 6, 1998) (citing *Roth*).

key consideration in that assessment is whether the withdrawal liability had accrued at the time the loans were made – an issue that is currently before an arbitrator. These disputes over the predicate facts underlying the factors preclude the entry of summary judgment for either party. The Court therefore denies both parties' motions as to Counts II and V.

**IV.    Conclusion**

For the reasons explained above, Plaintiffs' motion for summary judgment [35] is granted in part, as to Counts III and IV. Plaintiffs' motion is otherwise denied. Defendants' motion for summary judgment [28] is denied in its entirety.

Dated: March 25, 2013

Robert M. Dow, Jr.
United States District Judge